UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

                                :

UNITED STATES OF AMERICA      :

                                :

         - v. -                 :                  23 Cr. 504 (JSR)

                                :

FELIX HERRERA GARCIA,       :
GREI MENDEZ,                    :
RENNY PARRA PAREDES, AND   :
CARLISTO ACEVEDO BRITO,    :

                                :

                 Defendants.     :

                                :

------------------------------------------------------------ x

## THE GOVERNMENT'S OPPOSITION TO
## THE DEFENDANTS' MOTION TO DISMISS THE CONTROLLED SUBSTANCES
## ACT'S DEATH OR SERIOUS BODILY INJURY SENTENCING ENHANCEMENT

 

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Maggie Lynaugh
Brandon C. Thompson
Assistant United States Attorneys

*- Of Counsel -*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 1

APPLICABLE LAW ............................................................................................................... 9

ARGUMENT ........................................................................................................................ 10

I.      THE INDICTMENT IS LEGALLY SUFFICIENT AND WITHSTANDS THE
        DEFENDANTS' MOTION ....................................................................................... 10

II.     THE PLAIN MEANING OF "USE" INCLUDES "CONSUMING" OR
        "EXPENDING"........................................................................................................ 11

III.    THE GOVERNMENT'S ANTICIPATED EVIDENCE AT TRIAL MAKES
        CLEAR THAT THE VICTIMS "USED" THE CONTROLLED SUBSTANCE..... 12

IV.     THE DEFENDANTS' DEFINITION OF "USE" IS INAPPROPRIATELY
        NARROW .................................................................................................................. 14

V.      THE DEFENDANTS' INTERPRETATION OF "USE" IN THE CONTEXT
        OF THE CONTROLLED SUBSTANCES ACT EXCLUDES CONDUCT
        PLAINLY INTENDED TO BE CAPTURED BY THE SENTENCING
        ENHANCEMENT, DEFIES CONGRESSIONAL INTENT, AND
        CONTRAVENES JUDICIAL PRECEDENT .............................................................. 18

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Baez-Gil v. United States,*
  12 Civ. 266, 2013 WL 2422803 (D.N.H. June 4, 2013)................................................... 23, 24

*Bailey v. United States,*
  516 U.S. 137 (1995)........................................................................................................ 14

*Borden v. United States,*
  593 U.S. 420 (2021)........................................................................................................ 14

*Boyce Motor Lines v. United States,*
  342 U.S. 337 (1952)........................................................................................................ 10

*Burrage v. United States,*
  571 U.S. 204 (2014)............................................................................................. 12, 15, 16

*Dean v. United States,*
  556 U.S. 568 (2009)........................................................................................................ 16

*Dubin v. United States,*
  559 U.S. 110 (2023)........................................................................................................ 14

*Hamling v. United States,*
  418 U.S. 87 (1974).......................................................................................................... 9

*Heimer v. Companion Life Insurance Company,*
  879 F.3d 172 (6th Cir. 2018) ......................................................................................... 11

*Jones v. United States,*
  526 U.S. 227 (1999)........................................................................................................ 9

*Keplinger v. Superintendent,*
  2008 WL 4367584 (N.D. Ind. 2008)............................................................................... 11

*Leocal v. Ashcroft,*
  543 U.S. 1 (2004)..................................................................................................... 14, 15

*McNinch v. Guardian Life Insurance Company of America,*
  2022 WL 444133 (N.D.Ill. 2022) ................................................................................... 12

*Poniecki v. United States,*
  1992 WL 14108 (N.D.Ill. 1992) ..................................................................................... 12

*United States v. Alfonso,*
    143 F.3d 772 (2d Cir.1998) ........................................................................... 10

*United States v. Baker,*
    2007 WL 148796 (E.D. Mo. 2007) ............................................................... 22

*United States v. Bilyeau,*
    *2000 WL 33250843* (N.M.Ct.Crim.App. 2000) ....................................... 12

*United States v. Burkholder,*
    816 F.3d 607 (10th Cir. 2016) ...................................................................... 17

*United States v. Castleman,*
    572 U.S. 157 (2014) ......................................................................................... 14

*United States v. De La Pava,*
    268 F.3d 157 (2d Cir. 2001) ...................................................................... 9, 10

*United States v. Felder,*
    993 F.3d 57 (2d Cir. 2021) ....................................................................... 15, 17

*United States v. Feldman,*
    936 F.3d 1288 (11th Cir. 2019) ................................................................... 11

*United States v. Harden,*
    893 F.3d 434 (7th Cir. 2018) ....................................................................... 16

*United States v. Houston,*
    406 F.3d 1121 (9th Cir. 2005) ..................................................................... 17

*United States v. Jeffries,*
    958 F.3d 517 (6th Cir. 2020) ....................................................................... 15

*United States v. LaSpina,*
    299 F.3d 165 (2d Cir. 2002) ......................................................................... 10

*United States v. McIntosh,*
    236 F.3d 968 (8th Cir. 2001) ....................................................................... 16

*United States v. Ojeda,*
    951 F.3d 66 (2d Cir. 2020) ........................................................................... 15

*United States v. Patterson,*
    38 F.3d 139 (4th Cir. 1994) .................................................................... 16, 22

iv

*United States v. Pirro*,
    212 F.3d 86 (2d Cir. 2000) ................................................................................. 9, 10

*United States v. Post*,
    No. 08 Cr. 243 (KMK), 2013 WL 2934229 (S.D.N.Y. June 3, 2013) ........................................ 9

*United States v. Robinson*,
    167 F.3d 824 (3d Cir. 1999) .................................................................................. 22

*United States v. Scott*,
    990 F.3d 94 (2021) ........................................................................................... 14

*United States v. Seals*,
    2008 WL 1833119 (N.M.Ct.Crim.App. 2008) ............................................................. 12

*United States v. Skelos*,
    No. 15 Cr. 317 (KMW), 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) .................................. 10

*United States v. Smith*,
    508 U.S. 223 (1993) ......................................................................................... 14

*United States v. Thompson*,
    No. 13 Cr. 378 (AJN), 2013 WL 6246489 (S.D.N.Y. Dec. 3, 2013) ..................................... 9

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013) ................................................................................... 9

*United States v. Walker*,
    721 F.3d 828 (7th Cir. 2013) ................................................................................ 22

*United States v. Webb*,
    655 F.3d 1238 (11th Cir. 2011) .............................................................................. 12

*United States v. Wiley et. Al.*,
    3:22 Cr. 22 (S.D. Iowa 2022) ................................................................................ 23

*United States v. Yannotti*,
    541 F.3d 112 (2d Cir. 2008) ................................................................................. 9

*Voisine v. United States*,
    579 U.S. 686 (2016) ......................................................................................... 14

*Watson v. United States*,
    552 U.S. 74 (2007) .......................................................................................... 14

Statutes

18 U.S.C. § 924 ................................................................................................ 15

18 U.S.C. § 2225 ............................................................................................. 23

21 U.S.C. § 841 .......................................................... 2, 3, 4, 15, 16, 21, 23

21 U.S.C. § 846 ................................................................................................ 2

Rules

Federal Rule of Criminal Procedure 7 ............................................................. 9

Other Authorities

H.R. 5484, 99th Congress § 614 (Introduced in House) ............................... 21

H.R. 5484, 99th Congress § 614 (Placed on Calendar Senate) .................... 21

H.R. 5484, 99th Congress § 614 (Received in Senate) ................................. 21

H.R. 5484, 99th Congress § 1002  (Enrolled Bill) ....................................... 21

132 Cong. Rec. S. 16019 (daily ed. Oct. 14, 1986).  .................................. 21

132 Cong. Rec. S 14270 (daily ed. Sept. 30, 1986) ..................................... 21

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the defendants' motion (the "Motion") to strike the sentencing enhancement pled in Counts One and Two of the Indictment. The defendants argue that the enhancement, which applies to those who distribute or possess with intent to distribute controlled substances resulting in death or serious bodily injury, is not applicable in this case because the deceased child victim did not intentionally use a controlled substance.[1]  For the reasons set forth below, the defendants' motion should be denied.

## BACKGROUND

On September 15, 2023, at approximately 2:40 p.m., emergency personnel were called to Divino Niño Daycare (the "Daycare") in the Bronx. When they arrived, they found three children: two boys, each approximately two years old, and a girl, approximately eight months old. Both boys were unresponsive. All three children were rushed to the hospital. Despite intensive medical intervention, one of the boys was declared dead shortly after arrival. The medical examiner has determined his cause of death to be acute fentanyl intoxication. The other two children—one of whom was in cardiac arrest—tested positive for fentanyl, were hospitalized, treated, and ultimately survived. A fourth child, also approximately two years old, who had been picked up by a parent from the Daycare a short time before emergency services were called, was also rushed to the hospital after the child's parents realized the child was gravely ill. Like the others, that child tested positive for fentanyl, was treated, and survived.

---

[1] Defendant Grei Mendez filed the Motion on January 16, 2024. *See* ECF No. 26. Defendants Felix Herrera Garcia and Renny Antonio Parra Paredes have joined the motion. *See* ECF Nos. 25, 27.

The children were poisoned by fentanyl because, as investigators subsequently learned, the defendants chose to operate a fentanyl packaging and distribution facility inside the Daycare. Following the deadly poisoning, law enforcement personnel searched the Daycare, which was operated out of a one-bedroom basement apartment consisting of a playroom (the "Playroom"), a bathroom (the "Bathroom"), a kitchen (the "Kitchen"), and a bedroom (the "Bedroom"), on two occasions. The first search, pursuant to a warrant, occurred the same night the children were taken to the hospital and uncovered both narcotics and tools used to package narcotics for distribution, including a one-kilogram brick of fentanyl in a closet near the Bathroom and at least two "kilo press" machines.[2] Law enforcement officers returned with another warrant on or about September 21, 2023. During the second search, law enforcement officers found two large traps—or concealed compartments—beneath the floorboards of the Playroom. The traps contained stamps,[3] glassines, and other tools and instruments used to package, distribute, and traffic narcotics. In addition, more than approximately ten kilograms of narcotics, including fentanyl, para-fluorofentanyl, and heroin, were found hidden inside the traps.

## PROCEDURAL HISTORY

### A. The Indictment

On October 2, 2023, four individuals, Grei Mendez ("Mendez"), Felix Herrera Garcia ("Herrera Garcia"), Carlisto Acevedo Brito ("Acevedo Brito"), and Renny Antonio Parra Paredes ("Parra Paredes"), were indicted in two counts in connection with the drug trafficking operation being run out of the Daycare—one count of conspiracy to distribute narcotics resulting in death,

---

[2] Kilo presses are used by narcotics traffickers to compress illegal narcotics into kilogram-sized "bricks" in preparation for distributing wholesale quantities of narcotics.

[3] Narcotics traffickers often use stamps, stickers, or the like to mark or brand the narcotics that they distribute.

in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A), and one count of possession with intent to distribute narcotics resulting in death, in violation of Title 21, United States Code, Section 841(b)(1)(A).  Mendez was the operator of the Daycare and the individual with primary responsibility for caring for the children; Herrera Garcia is Mendez's husband; Acevedo Brito resided in the Bedroom of the Daycare; and Parra Paredes is a friend of Herrera Garcia.  Each defendant played an important role in the narcotics conspiracy.

**B. Defendants' Motion**

Mendez, Herrera Garcia, and Parra Paredes now seek to dismiss the sentencing enhancement pled in the Indictment, which raises the mandatory minimum period of incarceration for both charged offenses to 20 years' imprisonment if "death or serious bodily injury results from the use" of the charged controlled substance.  The defendants argue that the overdose enhancement does not apply because, despite the fact that the children—and, in particular, the child who died—were all poisoned by the fentanyl the defendants possessed and distributed, the children did not intentionally "use" a controlled substance.  The defendants contend that "use" requires "active employment" and must be "conscious and volitional."  Br. 4.  The defendants further contend that "use" in the statute is shorthand for "drug use," which the defendants define as "the active introduction of the controlled substance into one's body for the purpose of availing oneself of the substance's chemical effects."  Br. 5.  Finally, the defendants assume that the Government's theory at trial will be that the child who died at the Daycare died from passive or accidental "exposure" to fentanyl, and therefore cannot be the kind of "drug user" the Controlled Substances Act conceived as a victim.

The defendants are wrong.  *First*, the Government's proof at trial will show that the children, and in particular the decedent, ingested the fentanyl.  The children therefore used the fentanyl

3

in the identical way countless other victims of the opioid crisis have—by consuming it—and their use was no different from that of another such user. *Second*, the defendants' novel view of the statute reads a unique intent element—on the part of the crime *victim*—where none exists. Congress acted to enhance consequences to drug dealers who distribute or possess with intent to distribute controlled substances that cause death or serious physical injury to others, which is the obvious consequence of distributing poison such as fentanyl. The Court should rule that the intent of the victims is irrelevant under Section 841 of the Controlled Substances Act, and deny the Motion in its entirety.

## THE GOVERNMENT'S EXPECTED EVIDENCE AT TRIAL[4]

At trial, the Government expects to prove that the child who died at the Daycare[5] had fentanyl in his system because he consumed it orally—that is, he ingested the fentanyl. The Government expects the evidence will show the following.[6]

### A.    The Defendants' Drug Operation

The Government will present substantial evidence at trial that the defendants were running a drug packaging and distribution operation out of the Daycare. ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[4] The Government is not, in this brief, presenting the entirety of its expected evidence and continues to develop the evidence that it will present at trial in this matter.

[5] The Government presently is considering whether to seek a superseding indictment with charges pursuant to the "serious bodily injury" provision of 21 U.S.C. 841(b)(1)(A) with respect to one or more of the other children who consumed fentanyl at the Daycare.

[6] Certain laboratory reports remain pending—for example, the toxicology report on the contents of the deceased child's stomach and drug testing of the child's clothing.



will be supported by, among other things, evidence from the defendants' cellphones in which they exchange messages related to drug trafficking; narcotics and narcotics packaging materials found in Parra Paredes apartment that were consistent with the packaging materials found in the Daycare; and forensic evidence such as fingerprints tying the narcotics and narcotics packaging equipment at the Daycare to defendants Herrera Garcia and Parra Paredes.

### B.     Timeline of Events Within the Daycare on September 15, 2023

Other evidence the Government expects to present will establish a timeline of events within the Daycare on the day of the overdoses.  In particular, the Government expects to establish the following.  All four children who attended the Daycare on September 15, 2023, were dropped-off by their parents between approximately 8:25 and 8:45 a.m.  One of the three children was picked-up at approximately 12:50 p.m.  The other three children remained at the Daycare until

approximately 2:45 p.m., when emergency medical services arrived and rushed those children—two boys approximately age two and a girl approximately eight months' of age—to the hospital for medical treatment.  One of the boys was declared dead shortly after his arrival at the hospital. The other boy presented in acute respiratory failure and cardiopulmonary arrest.  The girl—the youngest child—was generally responsive, but did not react properly to pain.  During the course of their treatment, all three children tested positive for fentanyl and were administered naloxone. The fourth child, the child who was picked-up from the Daycare around 12:50 p.m., was taken separately to the hospital by his parents when they noticed that he appeared to be gravely ill shortly after picking him up.  That child similarly tested positive for fentanyl.  The medical examiner has determined the cause of death for the child who died to be acute fentanyl intoxication.

Following the poisonings of the children at the Daycare, Mendez explained to emergency personnel and law enforcement officers what the schedule had been inside the Daycare for the day. Specifically, she stated that all of the children seemed fine when they arrived at the Daycare. Around 11:00 a.m. or 11:30 a.m. she fed the children lunch.  Each day, Mendez prepared the food for the children, though the youngest child—the approximately eight-month-old girl—generally consumed mostly formula and only small amounts of prepared food.  Following their lunch, the children, with the exception of the child who was picked-up early, were put down for a nap.  When Mendez went to wake the children from their nap several hours later, she found the two boys unresponsive and ultimately called 911.

Thus, the evidence will establish that all four children in the Daycare became sick from fentanyl at approximately the same time and after eating a lunch prepared in a kitchen that the defendants used for drug trafficking activities.  The child who likely ate the least prepared food—the youngest child—became the least sick.

6

C.  **Felix Herrera Garcia Was in the Kitchen of the Daycare Prior to the Poison-
ings and Removed Evidence from the Daycare Prior to the Arrival of Emer-
gency Personnel**

Security camera footage from the building in which the Daycare was operated, combined with call records, will provide further insight into what happened on September 15, 2023. In particular, the Government expects the evidence to show that defendant Herrera Garcia, the leader of the Daycare drug trafficking operation, was in the Daycare for approximately five minutes around the children's lunchtime. When he left the Daycare, Herrera Garcia was carrying food items, including half an avocado, the other half of which could later be seen in photographs from the Daycare kitchen. Furthermore, after Mendez discovered the children unresponsive, but before she called 911, she called Herrera Garcia. Only minutes after hanging-up with Mendez, Herrera Garcia rushed through the front door of the Daycare. Approximately two minutes later, he exited out the back of the Daycare carrying two weighted bags. He then climbed through the bushes behind the Daycare, carrying those bags, and fled the scene, shortly before emergency personnel arrived.

Thus, the evidence will establish that Herrera Garcia, an individual known to have used the kitchen and kitchen utensils in the Daycare in connection with drug trafficking, was in the kitchen of the Daycare around the children's lunch time and then later removed evidence from the Daycare prior to the arrival of emergency personnel.

D.  **Loose Powders Were Not Present in the Daycare**

Photos and videos of the inside of the Daycare taken by law enforcement officers on September 15, 2023, will establish that no loose, exposed powders can be seen in the Daycare, and that the narcotics that were found in the Daycare were packaged in sealed bags and/or located in a compartment underneath the floor of the Daycare. Additionally, the Government expects that the handler of a narcotics-detecting canine who searched the Daycare the night of the poisonings will

testify that before he ran his canine through the Daycare to search for controlled substances, he specifically looked for any loose, exposed powders that could pose a threat to his dog's safety. He did not find any. Moreover, other than the children, no one in the Daycare on September 15, 2023, including Mendez, presented with fentanyl poisoning symptoms.

### E.    The Properties of Fentanyl

Finally, the Government expects to present testimony from a physician who specializes in emergency medicine and toxicology to testify about the properties of fentanyl and how fentanyl overdoses occur. The Government expects that such testimony will establish the following. *First*, that fentanyl is an extremely dangerous substance that can cause fatal overdoses in both children and adults. *Second*, that based on the chemical properties of fentanyl, exposed, unpackaged fentanyl in a room does not result in ambient fentanyl floating in the air. Accordingly, it is highly unlikely that the children in this case had fentanyl in their systems due to passive inhalation of the drug. The fact that Mendez, who was in the Daycare and exposed to the same air as the children, was not affected, confirms that the source of the fentanyl was not the air. *Third*, that while it is possible for fentanyl to be absorbed through skin, it is exceedingly unlikely that this is the manner of contact with fentanyl that resulted in the Daycare death and injuries. That is because dermal absorption of fentanyl takes time. In this case, where the victims arrived at the Daycare around 8:30 a.m. and were poisoned within a few hours, not enough time elapsed for skin exposure to fentanyl to be the source of fentanyl in the children's systems. *Fourth*, oral mucosa—that is, the membranes in the mouth—absorb fentanyl effectively and fentanyl poisoning can occur through ingestion. An individual need only ingest a miniscule amount of fentanyl in order to consume a lethal dose. *Fifth*, the fact that all of the children in the Daycare experienced symptoms and that the children's symptoms all began after being fed lunch, is consistent with the children having

consumed the fentanyl orally and its having been absorbed either in the oral mucosa or digestive tract.  Taking all of this together, the physician will conclude that the overwhelmingly likely manner in which the children were exposed to fentanyl on the day of the poisonings is by ingestion—having eaten it either through their food or by touching it and putting it in their mouths.

*   *   *

Taking all of this together, the Government expects to prove at trial that the child who died at the Daycare on September 15, 2023, orally consumed, that is, ingested, the fentanyl that killed him.

## APPLICABLE LAW

"A criminal defendant is entitled to an indictment that states the essential elements of the charge against him."  *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) (citing *Jones v. United States*, 526 U.S. 227, 232 (1999); *Hamling v. United States*, 418 U.S. 87, 117 (1974); Fed. R. Crim. P. 7(c)).  "A defendant faces a 'high standard' in seeking to dismiss an indictment."  *United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *6 (S.D.N.Y. Dec. 3, 2013) (quoting *United States v. Post*, No. 08 Cr. 243 (KMK), 2013 WL 2934229, at *5 (S.D.N.Y. June 3, 2013)).  "The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights."  *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001).

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'"  *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Rule 7(c) (alterations omitted)).  To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks omitted).  "An

9

indictment . . . need not be perfect, and common sense and reason are more important than techni-

calities." *De La Pava*, 268 F.3d at 162.

"[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to

dismiss an indictment." *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir.1998). Accordingly,

"[i]n reviewing a motion to dismiss an indictment, the Court must take the allegations of the in-

dictment as true." *United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, at *2

(S.D.N.Y. Oct. 20, 2015) (citing *Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n.16

(1952)). Indeed, "[a]n indictment must be read to include facts which are necessarily implied by

the specific allegations made." *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (inter-

nal quotation marks omitted).

## **ARGUMENT**

### I.   **The Indictment is Legally Sufficient and Withstands the Defendants' Motion**

As an initial matter, the Indictment in this case is sufficiently specific and this alone is

enough for the Court to deny the Motion. To obtain dismissal, a defendant must show that the

charging instrument fails to state the essential elements of the charges against him. *See Pirro*, 212

F.3d at 91 (2d Cir. 2000). Here, Count One of the Indictment tracks the language of conspiracy to

distribute narcotics resulting in death, and Count Two of the Indictment tracks the language of

substantive possession with intent to distribute narcotics resulting in death. The Indictment pro-

vides the approximate time frame and location of the alleged crimes, and specifies that the death

charged in both Counts resulted from the use of the controlled substances. These allegations,

alone, are sufficient. While the defendants may challenge the Government's evidence at trial,

doing so is inappropriate on a motion to dismiss. Accordingly, the Court should deny the defend-

ants' motion on this basis alone.

## II.     The Plain Meaning of "Use" Includes "Consuming" or "Expending"

Contrary to the defendant's contorted definition, in the context of the Controlled Substances Act, the plain meaning and most natural understanding of "use" is "to expend or consume by putting to use," Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/use (last visited February 29, 2024),[8] and "the action of consuming something as food, drink, a drug, etc., esp. on a regular or habitual basis; the fact of being consumed this way," Oxford English Dictionary, https://www.oed.com/dictionary/use_n?tab=meaning_and_use#16010028 (last visited February 29, 2024).  This understanding is also consistent with what one conveys when saying someone "used" a drug—through bodily consumption, typically by means of ingestion, injection, inhalation, or topical application.  The act of using the controlled substance necessarily expends the supply; when a controlled substance has been "used" it is depleted and cannot be used again.  The body of the user puts the controlled substance to use by carrying out the metabolic, chemical, and physiological processes necessary to process the controlled substance.

Courts in this country have applied this understanding of "use" when assessing whether an individual has "used" a controlled substance.  *See, e.g.*, *Heimer v. Companion Life Insurance Company*, 879 F.3d 172, 174 (6th Cir. 2018) (explaining that "use" means "the action of consuming something as food, drink or a drug" when determining whether an individual had "used" any unauthorized controlled substance); *Keplinger v. Superintendent*, 2008 WL 4367584, at *2 (N.D. Ind. 2008) (finding, in a case concerning prison regulation prohibiting inmates from possessing or using any unauthorized substance, that "use" means "to expend or consume"); *see also United States v. Feldman*, 936 F.3d 1288, 1321 (11th Cir. 2019) (endorsing a jury instruction that "in order to conclude that death had resulted from a particular Schedule II drug, it must find that but

---

[8] The above is the verb form of the definition of use, but the noun form is, in part, defined as "the fact or state of being used."

for *ingestion* of that drug, death would not have occurred.") (emphasis added); *United States v. Webb*, 655 F.3d 1238 (11th Cir. 2011) (the district court properly instructed that "but for the victims' ingesting the controlled substances charged in the indictment, the victims would not have died"); *McNinch v. Guardian Life Insurance Company of America*, 2022 WL 444133, at *3, 7 (N.D.Ill. 2022) (employing "use" and "ingest" interchangeably to describe a decedent who died "due to combined drug (cocaine and fentanyl) toxicity"); *United States v. Bilyeau*, 2000 WL 33250843, at *1 (N.M.Ct.Crim.App. 2000) ("by ingesting the tablet, he wrongfully used both methamphetamine and amphetamine"); *United States v. Seals*, 2008 WL 1833119, at *5 (N.M.Ct.Crim.App. 2008) ("[T]he appellant actually used ecstasy, and knew he was ingesting it."); *Poniecki v. United States*, 1992 WL 14108, at *2 (N.D.Ill. 1992) ("Instead, however, petitioner openly admitted to periodic cocaine use, and surmised that he had ingested the drug the day of the urine screen.").

Finally, the Government's definition in no way renders the word "use" meaningless within the statute. Even under the Government's definition, the enhancement would not apply if, for example, a kilogram of cocaine a defendant was trafficking fell out of an apartment window, hit someone on the head, killing or injuring them. In that scenario, no one has "used" (that is, consumed) the cocaine, and the sentencing enhancement does not apply. But where a victim has consumed a controlled substance, by, for example, ingestion, the victim has "used" the controlled substance within the meaning of the statute. *See* Brief for the United States, *Burrage v. United States*, No. 12-7515, 2013 WL 5461835, at *38 (Oct. 1, 2013).

## III.    The Government's Anticipated Evidence at Trial Makes Clear that the Victims "Used" the Controlled Substance

At trial, the Government expects to establish that the child who died at the Daycare "used" fentanyl within the meaning of the statute because he orally consumed it on September 15, 2023.

As set forth in detail above, the Government expects to introduce evidence that the defendants used the kitchen and kitchen items to prepare controlled substances, including fentanyl. The Government further plans to introduce evidence that Mendez fed lunch to the children at the Daycare shortly before they all simultaneously experienced fentanyl poisoning, and right around the time that Herrera-Garcia entered the Daycare and used the Kitchen. The Government will also introduce evidence establishing that general, environmental or passive poisoning was not the reason fentanyl ended up in the children's bodies, because loose fentanyl powder does not result in fentanyl floating in the air that could trigger fentanyl poisoning and, in any event, the Daycare did not have loose powder in it when emergency personnel arrived on the scene. Finally, the Government will introduce evidence establishing that ingestion of miniscule amounts of fentanyl that are absorbed either in the digestive tract or the oral mucosa in the mouth are sufficient to poison children. The evidence will establish that the defendants' decision to use the Daycare to operate a fentanyl packaging facility and to prepare food for the children using spaces and equipment shared with the fentanyl operation led to the children's collective and simultaneous ingestion and rapid onset illness from the fentanyl they used.

On a plain reading of the statute, the victims' ingestion of the fentanyl constitutes "use" of a controlled substance. Here, the victims consumed or used the fentanyl in at least two ways: *First*, like many other victims of the fentanyl crisis, they used it when they simply put it into their mouths. Once the victims ingested the fentanyl, the controlled substance had been expended and was no longer available; it had been used. *Second*, after ingestion, the victims' bodies began the metabolic, chemical, and physiological processes necessary to process the fentanyl. Their bodies were using the fentanyl. This process led to the poisoning of all of the children, the death of one child, and acute hypoxic respiratory failure and cardiopulmonary arrest in one of the other victims.

The children's use of the fentanyl, and in particular the effect the fentanyl had on them after that use, was the result of the defendants' decisions to traffic massive quantities of fentanyl in a daycare and it is why the defendants are exposed to the heightened penalties Congress contemplated.  To rule otherwise would twist Congress's intent by shielding the defendants from the sentencing enhancement applicable to their exceptional callousness and inhumanity in committing their drug offense, and fail the most vulnerable victims of drug trafficking.

## IV.    The Defendants' Definition of "Use" Is Inappropriately Narrow

The Supreme Court has made clear that "when interpreting a statute that features as elastic a word as "use," we construe language in its context and in light of the terms surrounding it," *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004); *see also, e.g.*, *Dublin v. United States*, 599 U.S. 110, 117-18 (2023) (explaining that "use" has been "singled out by this Court as particularly sensitive to context," noting that "'use' poses some interpretational difficulties because of the different meanings attributable to it," and observing that "'use' takes on different meanings depending on context").  Ignoring the Supreme Court's guidance, the defendants rely on an inflexible and rigid definition of the term.

### A.  The Defendants Rely on Inapposite Caselaw

The defendants urge that the meaning of "use" is not only "[t]o convert to one's service," "to employ," "to avail oneself of," and "to carry out a purpose or action by means of," but also that use "requires 'active employment'" and that active employment "can only constitute 'use' when it is conscious and volitional."  Br. 4.  For the very reason the Supreme Court noted above, the cases on which the defendants rely for this proposition are inapposite.  Those cases analyze "use" by a *defendant* in the particular "use of force" or "use of a firearm" contexts.[9]   Such cases

---

[9] *See* Br. 4-5 ((citing *United States v. Scott*, 990 F.3d 94, 112 (2021)) (en banc) (use of force); *United States v. Castleman*, 572 U.S. 157, 170-71 (2014) (use of force); *Borden v. United States*,

inherently have an accompanying action and intent requirement that a *defendant* must satisfy in order to have engaged in criminal conduct.  This makes sense.  Under criminal law, strict liability is rare, and the Government is generally required to prove a defendant has not only engaged in criminal conduct but also acted with the requisite intent.  *See United States v. Ojeda*, 951 F.3d 66, 75 (2d Cir. 2020) ("a crime's elements serve to give notice of both the actus reus proscribed by a particular crime and the *mens rea* requirement for culpability").

In this case, however, the defendants insist that what is relevant is the intent of the victim— a party with respect to whom neither action nor intent is generally required by the criminal law. Indeed, the defendants cite no cases in which the Government must prove the intent of a crime victim.  Thus, the defendants' reliance on cases parsing whether a defendant has "used" a firearm within the context of Title 18, United States Code, Section 924(c) or engaged in the "use of force" for the purposes of the Armed Career Criminal Act, are of little value here.  Even if the word "use" requires active employment or volition in those cases, it only does so because of the particularities of those statutes and the general requirement that a defendant act with requisite intent.  It does not make sense to read such requirements into every instance of "as elastic a word as use," especially since "one may, in theory, actively employ something in an accidental manner."  *Leocal* at 9.

Furthermore, federal courts that have considered the issue of whether an overdose death must be foreseeable to a defendant in order for the defendant to be held liable under the death resulting enhancement have uniformly concluded that the statute does not have a proximate cause requirement.  *See United States v. Felder*, 993 F.3d 57, 69 (2d Cir. 2021) ("every court of appeals

---

593 U.S. 420, 430-31 (2021) (use of force); *Voisine v. United States*, 579 U.S. 686, 694 (2016) (use of force); *United States v. Smith*, 508 U.S. 223, 228-29 (1993) (use of a firearm); *Bailey v. United States*, 516 U.S. 137, 144-45 (1995) (use of a firearm); *Watson v. United States*, 552 U.S. 74, 79 (2007) (use of a firearm)).

to address the question has concluded that § 841(b) does not require proof that the resulting death was reasonably foreseeable"); *United States v. Jeffries*, 958 F.3d 517, 520 (6th Cir. 2020) ("every sister circuit to address the question (before and after [*Burrage v. United States*, 571 U.S. 204 (2014)]) holds that the penalty provision does not require proof of proximate causation").  In reaching that conclusion, courts have found that the enhancement does not impose on the defendant a knowledge or intent requirement for the death; rather the enhancement sets forth a strict liability policy when death results.  *See, e.g.*, *United States v. Harden*, 893 F.3d 434, 448 (7th Cir. 2018) ("due to the extremely hazardous nature of drug distribution, a policy of strict liability when death occurs fits the statutory language and its evident purpose"); *United States v. McIntosh*, 236 F.3d 968, 973 (8th Cir. 2001), *abrogated on other grounds by Burrage v. United States*, 571 U.S. 204, (2014) ("The underlying offense holds those who manufacture a drug strictly liable when death results from the manufactured drug."); *United States v. Patterson*, 38 F.3d 139, 145 (4th Cir. 1994) ("[w]here serious bodily injury or death results from the distribution of certain drugs, Congress has elected to enhance a defendant's sentence regardless of whether the defendant knew or should have known that death would result").  It would be highly unusual to impose an intent requirement on overdose *victims*, where courts have uniformly refused to impose such an intent requirement on the *dealer-defendant*s with respect to the death.

**B.  The Defendants Ignore that the Enhancement Is Written in the Passive Voice**

Additionally, the defendants ignore the fact that the enhancement is written in the passive voice.  The statute states that "if death or serious bodily injury results from *the use of*" the charged substance, then the mandatory minimum punishment shall be no less than 20 years.  21 U.S.C. § 841(b)(1)(A) (emphasis added).  The Supreme Court has made clear that the "passive voice focuses on an event that occurs without respect to a specific actor, and therefore without respect to

any actor's intent or culpability." *Dean v. United States*, 556 U.S. 568, 572 (2009) (discussing firearms statute). Thus, where a statute uses the passive voice, "[i]t is whether something happened—not how or why it happened—that matters." *Id.* Indeed, the Tenth Circuit Court of Appeals has stated that with respect to this particular statute, the statute's use of the passive voice "evinces a concern with 'whether something happened—not how or why it happened." *United States v. Burkholder*, 816 F.3d 607, 614 (10th Cir. 2016). That statement has been adopted by the Second Circuit. *See Felder*, 993 F.3d 57, at 69-70 (reciting *Burkholder*'s interpretation of the statute, agreeing with *Burkholder*'s reasoning, and then adopting Burkholder's reasoning "as [its] own" and applying it to the federal carjacking statute); *see also United States v. Houston*, 406 F.3d 1121, 1124 (9th Cir. 2005) (the statute's "passive language unambiguously eliminates any statutory requirement that the death would have been foreseeable. According to its language, as long as death 'results' from the use of a described controlled substance, the person convicted of distributing the substance" shall be subject to enhanced penalties). Thus, reading an intent requirement into a statute written in the passive voice, as the defendants would have the Court do, would be directly contrary to guidance from both the Supreme Court and Second Circuit.

## C. The Defendant's Definition of "Use" Fails to Capture Common Usages of the Word

Common sense and everyday parlance also demonstrate that the defendants' proposed definition of "use" is overly restrictive. "Use" routinely conveys and captures circumstances in which individuals or objects do not consciously or volitionally employ anything. For example: A car uses gas. A lamp uses a lightbulb. Fire uses oxygen to grow and expand. Plants use sunlight to perform photosynthesis. An intubated patient in a coma uses a ventilator. Babies use diapers, and car seats, and strollers, and a nearly infinite list of other things because babies, even though they can't form intent, *use* things. In none of those cases is the car, lamp, fire, plant, intubated patient,

or the infant consciously or volitionally employing anything.  Yet one would not take issue with "use" describing any of those circumstances.

Finally, contrary to defendant's assertions, in common language "use" can be accidental. For example, one can accidentally use someone else's toothbrush, or accidentally use sugar when a recipe calls for salt, or accidentally use the wrong medicine to treat an ailment.  In short, "use" encompasses far more conduct than the defendants' definition allows for, and includes conduct that is both conscious and unconscious, purposeful and accidental.

## V.   The Defendants' Interpretation of "Use" in the Context of the Controlled Substances Act Excludes Conduct Plainly Intended to be Captured by the Sentencing Enhancement, Defies Congressional Intent, and Contravenes Judicial Precedent

Applying more specificity to their definition, the defendants argue that the "best and most natural" interpretation of "use" in the context of the Controlled Substances Act's overdose enhancement is "the active introduction of the controlled substance into one's body for the purpose of availing oneself of the substance's chemical effects."  Br. 5.  There is nothing natural about that interpretation.  It imposes on the single word "use" an activity requirement ("active introduction"), an intent requirement ("for the purpose of"), and a knowledge requirement ("substance's chemical effects"), all regarding the victim.  Rather than the natural reading, the proposed definition layers multiple meanings on "use" that the word, alone or in the context of the statute, simply cannot bear.  As a result, the defendants' proposed definition is unworkable for at least three reasons. *First*, it would perversely restrict the relevant sentencing enhancement to only those cases involving victims who directly, openly, and intentionally embraced the risks of drug consumption, and entirely carve out the most vulnerable, naïve, and unwitting victims of drug trafficking.  *Second*, it undermines Congress's desire and intent in passing the Controlled Substances Act with this sentencing enhancement.  *Third*, other courts have rejected the defendants' definition.

### A.  Exclusion of Conduct Covered by the Sentencing Enhancement

Limiting drug "use" to scenarios in which a victim actively introduces a particular controlled substance into his body for the purpose of availing himself of the substance's chemical effects would result in bizarre outcomes that do not comport with the everyday understanding of "use" and would preclude the enhancement from protecting the most innocent victims of the drug trade.  In particular, applying the defendants' suggested definition would mean that the overdose enhancement could never apply to victims who are young children.[10]  That is because very young children do not yet have the capacity to understand what fentanyl—or any other controlled substance—is, and, therefore, are not capable of intentionally introducing the controlled substance into their bodies for the purpose of inducing its chemical effects.

Similarly, applying defendants' definition would categorically exclude a victim who does not know what controlled substance he is taking.  Consider the following scenario: Person A asks Person B to sell him a supply of homeopathic weight-loss supplements.  Person B sells Person A what, ostensibly, appear to be homeopathic weight-loss supplements and tells him that he has sold him homeopathic weight-loss supplements.  In reality, Person B has knowingly sold Person A methamphetamine.  Person A ingests the substance, believing it to be a homeopathic weight-loss supplement, and dies.  Applying the defendants' definition of "use" to these facts, Person B would not be subject to the Controlled Substances Act's sentencing enhancement because Person A ingested the substance believing that it was a homeopathic weight-loss supplement and to avail himself of the supplement's chemical effects—not those of methamphetamine or any other controlled

---

[10] This risk is particularly acute given, for example, the prevalence of fentanyl and meth pills made to look like candy or even vitamins, in a variety of colors, and shapes like cartoon characters. *See, e.g.*, Drug Enforcement Administration, "DEA Warns of Brightly-Colored Fentanyl Used to Target Young Americans," *available at* https://www.dea.gov/press-releases/2022/08/30/dea-warns-brightly-colored-fentanyl-used-target-young-americans (last visited March 3, 2024).

substance.  But that cannot be squared with case law, *see* Section V.C., *infra*, or common sense. Just as a defendant does not have to know precisely what kind of controlled substance he is selling, a victim does not need to know what he is using.  It cannot be that in order for the sentencing enhancement to apply, a court must inquire into what the victim knew about the substance he was taking and its chemical effects.

Furthermore, it would be bizarre and defy logic for Congress to require specific proof concerning a deceased victim's actions and intent, when all that is required of a defendant is that he knew he distributed or possessed with intent to distribute a controlled substance.  That makes no sense and cannot be reconciled with Congress's intent in passing the Anti-Drug Abuse Act of 1986, *see* Section V.B., *infra*.

Finally, the defendants' proposed definition would bar, for example, all applications of the sentencing enhancement where death or serious bodily injury results from the use of a drug by an unwitting victim.  Consider the following scenario:  an individual distributes a controlled substance by surreptitiously dropping it in a woman's drink.  The woman consumes the drink and overdoses. The woman, of course, never knew that her drink contained a controlled substance.  Applying the defendants' logic, the overdose enhancement would not cover the perpetrator's conduct because the victim never "actively introduced the controlled substance into her body for the purpose of availing herself of the substance's chemical effects."  It cannot be the case that the death resulting sentencing enhancement is not meant to cover such a scenario.  As set forth in detail below, Congress made it evident that it sought to punish drug dealers for the natural consequences of distributing dangerous drugs and the effect those drugs have on the victims; it did not intend to restrict the enhancement to the class of cases in which the victim is the most complicit in his or her own

demise, or cases where, fortuitously, detailed evidence of the deceased victim's intent and conduct survives the victim.

### B. Congressional Intent

The defendants' proposed definition of "use" contradicts Congress's desire in enacting legislation with enhanced penalties where death of serious bodily injury results from the use of a controlled substance. In the fall of 1986, the Senate debated the Omnibus Drug Enforcement, Education, and Control Act of 1986, an omnibus bill seeking to amend a broad swath of preexisting drug-related laws. The sentencing enhancement now codified at Title 21, United States Code, Section 841(b)(1)(A), was read on the floor, but not directly discussed by senators. What senators did discuss, however, were the aims that animated the overall legislation. In particular, on September 30, 1986, Senator DeConcini stated:

> this legislation sends a clear message to those who decide to make their living in the insidious business of drug trafficking that we are no longer going to tolerate their activities . . . . In addition, if death or serious bodily harm results from a violation of this section, the drug dealer would face 10 years to life and up to $4 million in fines.[11]

132 Cong. Rec. S 14270 (daily ed. Sept. 30, 1986) (statement of Sen. DeConcini). Additionally, on October 14, 1986, the Senate debated a provision that amended a statute calling for the death penalty for drug dealers if a transaction led to someone's death. As part of this debate, Senator Thurmond asked Senator Hatch whether drug dealers were the individuals most likely to die from

---

[11] The Omnibus Drug Enforcement, Education, and Control Act of 1986 was debated in the senate on multiple dates. Although in his remarks on September 30, 1986, Senator DeConcini stated that a drug dealer "would face 10 years to life" if death or serious bodily harm resulted, each iteration of the Omnibus Drug Enforcement, Education, and Control Act of 1986 contemplated a mandatory minimum period of incarceration of 20 years in cases involving death or serious bodily harm. *See* H.R. 5484, 99th Congress § 614 (Sept. 8, 1986) (Introduced in House); H.R. 5484, 99th Congress § 614 (Sept. 15, 1986) (Received in Senate); H.R. 5484, 99th Congress § 614 (Sept. 24, 1986) (Placed on Calendar Senate); H.R. 5484, 99th Congress § 1002 (Oct. 17, 1986) (Enrolled Bill).

use of controlled substances.  Senator Hatch responded:

> I do not agree with the statement that [the dealers] are the people who are likely to die from the overuse of drugs. I have seen 10-, 12-, 14-, 16-year-old children who have died from the misuse of drugs. We saw Lenny Bias die from the misuse of drugs. I do not believe anybody believes he was a pusher or within the syndicate.

132 Cong. Rec. S. 16019 (daily ed. Oct. 14, 1986).  Senator DeConcini's remarks demonstrate that the underlying intent behind the Omnibus Drug Enforcement, Education, and Control Act of 1986 was to impose enhanced sentencing penalties on drug dealers whose *conduct* resulted in death or serious bodily harm of victims, not require that the victims manifest any particular *mens rea* in using the drugs in question.  The focus was plainly on the harm the substances cause and the responsibility the dealers have in distributing them.  Senator Hatch's comments demonstrate that protecting youth from drugs was a primary, motivating factor behind the legislation.  As set forth above, however, the defendants proposed definition of "use" at best, undermines, and, at worst, renders impossible, both of these goals.

Caselaw interpreting the congressional intent behind the statute confirms this is the case. *See, e.g.*, *Patterson* at 145 ("The statute puts drug dealers and users on clear notice that their sentences will be enhanced if people die from using the drugs they distribute . . . . Where serious bodily injury or death results from the distribution of certain drugs, Congress has elected to enhance a defendant's sentence regardless of whether the defendant knew or should have known that death would result"); *United States v. Robinson*, 167 F.3d 824, 831 (3d Cir. 1999) ("In short, Congress recognized that the risk is inherent in [narcotics] and thus it provided that persons who distribute it do so at their peril."); *United States v. Walker*, 721 F.3d 828, 838 (7th Cir. 2013), *vacated on other grounds by Lawler v. United States*, 572 U.S. 1111 (2014) ("we also have no doubt that in setting a twenty-year mandatory minimum sentence, Congress sought to emphasize the inherent

22

dangers associated with distributing controlled substances and to severely penalize sellers").

### C.  Judicial Precedent

Courts across this country have also explicitly rejected the proposed interpretation of drug "use" the defendants ask this Court to accept.  For example, in *United States v. Baker*, a victim died after ingesting a controlled substance to prevent law enforcement from finding him with it. *United States v. Baker*, 2007 WL 148796, at *2 (E.D. Mo. 2007).  Although the victim introduced the controlled substance into his body for a purpose other than availing himself of the substance's chemical effects, the court held that the victim had "used" the controlled substance for the purposes of the sentencing enhancement.  The court explained:

> Nowhere does the statute require that the substance be used as *intended*, and the court should decline to insert this restrictive meaning into the statute . . . . Indeed, such a restrictive meaning would appear to run counter to Congress's intent underlying § 841(b)(1)(C) to severely punish the conduct of drug traffickers for their distribution of drugs, regardless of whether the consequences of this unlawful conduct are expected or unexpected.

*Id.* at *7-*8 (emphasis in original).  Additionally, at a recent trial in the United States District Court for the Southern District of Iowa, a jury found facts that reject the defendants' constrictive understanding of drug "use."  *See United States v. Wiley et. al.*, 3:22 Cr. 22 (S.D. Iowa 2022).  In *Wiley*, an 18-month-old victim swallowed pills containing Percocet and fentanyl.  After ingesting the pills, the child stopped breathing, but medical professionals successfully revived him.  Wiley was charged with, among other things, conspiracy to distribute fentanyl resulting in serious bodily injury in connection with the poisoning of the 18-month-old victim.  A jury convicted him at trial, applied the sentencing enhancement and, therefore, found that the 18-month-old child used the fentanyl by virtue of having ingested the pills.

In support of their proposed definition of "use," the defendants cite a single case interpreting the enhancement, *Baez-Gil v. United States,* 12 Civ. 266, 2013 WL 2422803, at *1, 4 (D.N.H.

23

June 4, 2013).   *See* Br. 5.   In that case, defendant Baez-Gil pled guilty to conspiracy to possess

with intent to distribute and conspiracy to import cocaine.   *Id.* at *1, 4.   Because one of his co-

conspirators died after swallowing 40 rubber balloons filled with cocaine for the purpose of smug-

gling the cocaine into the United States, Baez-Gil was subject to the sentencing enhancement.   *Id.*

at *1.   After conviction and sentencing, Baez-Gil sought relief under Title 18, United States Code,

Section 2225.   Baez-Gil claimed that his lawyer provided ineffective assistance of counsel by fail-

ing to argue that "use" for the purposes of the sentencing enhancement meant "the ingestion or

introduction of a controlled substance into one's body 'for the purpose of obtaining the benefit or

reaction from the drug."   *Id.* at *3.   The court denied Baez-Gil's petition.   The Court did not reach

whether the decedent co-conspirator had "used" the cocaine; however, it expressed skepticism at

Baez-Gil's proposed definition of "use"—one that closely mirrors the definition proposed by the

defendants in this case.   *Id.*   While the court found the defendant's proposed definition "not

without merit," it went on to say that "it [was] by no means clear, though, that [this] interpretation

is correct" and that "the court has not found any cases that endorse [this] interpretation".   *Id.* at *1,

4 (D.N.H. June 4, 2013).   The only case that the defendants cite, therefore, undermines the very

definition of "use" that they advance.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the defendants' motion in its entirety.

Dated: New York, New York
March 5, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   _____/s/_____
Brandon C. Thompson
Maggie Lynaugh
Assistant United States Attorneys
(212) 637-2444/2448