```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

---

UNITED STATES OF AMERICA,

v.

FELIX HERRERA GARCIA et al.,

Defendants.

---

23-cr-504 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

On January 16, 2024, defendant Grei Mendez filed a motion to strike the overdose enhancement in the indictment. See Def. Mendez Mot. to Strike the Overdose Enhancement ("Def. Opening Br."), ECF No. 26. Defendants, Felix Herrera Garcia and Renny Antonio Parra Paredes, then joined in that motion. See Notice of Mot. for Def. Renny Antonio Parra Paredes, ECF No. 25; Mot. for Joinder, ECF No. 27. Upon due consideration of the parties' written submissions and oral argument, the Court hereby denies the motion to strike.

I. **Factual Background**

The following facts are drawn from the Government's factual proffer, which the Court accepts as true solely for the purposes of resolving this motion.[1] Ms. Mendez operated Divino Niño Daycare

---

[1] The Court does so because defendants agreed that they "accept [the Government's factual proffer] as true solely for the purpose of this motion." Def. Reply Mem. in Supp. of Mot. to Strike the Overdose Enhancement ("Def. Reply Br."), at 1, ECF No. 40.

1

out of a one-bedroom apartment in the Bronx. At the same time, Ms. Mendez along with her husband, Mr. Herrera Garcia, and her husband's friend, Mr. Parra Paredes, operated a narcotics packaging and distribution ring out of the same apartment. Defendants would package narcotics in the bedroom, store narcotics under the floor in the playroom, and prepare the drugs for packaging in the kitchen, sometimes even using the kitchen supplies to do so.

On September 15, 2023, four healthy children were dropped off at Divino Niño Daycare between 8:25 and 8:45 in the morning. Between 11:00 and 11:30 a.m., Ms. Mendez prepared lunch for the children in the kitchen of the apartment. At 12:50 p.m., one of the children was picked up by his parents. Ms. Mendez put the other three children, two boys who were approximately two years old and one girl who was approximately eight months old, down for a nap. Several hours later when Ms. Mendez attempted to wake up the children, the two boys were unresponsive. Ms. Mendez first called Mr. Herrera Garcia and then called 9-1-1. At 2:45 p.m., emergency medical personnel arrived at the daycare and rushed all three children to the hospital. Shortly thereafter, one of the boys died. His cause of death was determined to be acute fentanyl poisoning. The other boy was in respiratory failure and cardiopulmonary arrest but ultimately survived. He tested positive for fentanyl. The 8-month-old girl was responsive when she arrived at the hospital but

2

also tested positive for fentanyl. The parents of the fourth child, who was picked up early, separately rushed their child to the hospital after he became ill. That child also tested positive for fentanyl.

According to the Government, the evidence will establish that all four children suffered fentanyl poisoning at around the same time after they ate food that was prepared in the kitchen of the apartment, the very same kitchen that was used to prepare narcotics for packaging. The Government contends that the evidence will also show that there was no loose fentanyl powder inside the daycare on September 15, 2023. Thus, the Government's medical expert will testify that "it is highly unlikely that the children in this case had fentanyl in their systems [because of] passive inhalation of the drug" or because they absorbed fentanyl through their skin. Gov't Opp'n to Defs. Mot. to Dismiss ("Gov't Opp'n"), at 8, ECF No. 38. Instead, the Government's expert will testify that the most likely manner in which the children were poisoned was through oral ingestion of fentanyl, either through consuming contaminated food or touching fentanyl and then putting it in their mouths.

On October 2, 2023, Mr. Herrera Garcia, Ms. Mendez, and Mr. Parra Paredes were indicted for conspiracy to distribute narcotics resulting in death and possession with intent to distribute narcotics resulting in death. See Indictment, ECF No. 10. On January 16, 2024, Ms. Mendez filed a motion to strike the overdose

enhancement in the indictment, which was joined by her co-defendants, Mr. Herrera Garcia and Mr. Parra Paredes. After the motion and the Government's opposition was filed, the Government filed a superseding indictment against Mr. Herrera Garcia, Mr. Parra Paredes, and Ms. Mendez on March 14, 2024. See Superseding Indictment, ECF No. 41. The superseding indictment charges defendants with conspiracy to distribute narcotics resulting in death and serious bodily injury, possession with intent to distribute narcotics resulting in death, and possession with intent to distribute narcotics resulting in serious bodily injury. Id. The Court will thus treat defendants' motion to strike as aimed at both the indictment and superseding indictment.

II. **Motion to Strike**

Defendants' motion to strike raises an important and novel question of statutory interpretation: What does "use" mean in 21 U.S.C. § 841(b)(1)(A)?[2] Under the relevant statutory provision, a defendant convicted of conspiracy to distribute "400 grams or more of a mixture or substance containing a detectable amount of" fentanyl faces a mandatory minimum sentence of 20 years' imprisonment "if death or serious bodily injury results from *the*

---

[2] The Court is aware of only two out-of-circuit district court cases that have even arguably addressed this question. See United States v. Baker, No. 4:05-CR-496, 2007 WL 148796, at *7-*8 (E.D. Mo. Jan. 16, 2007); Baez-Gil v. United States, 12-cv-266, 2013 WL 2422803, at *1, *4 (D.N.H. June 4, 2013).

4

*use* of such substance." 21 U.S.C. § 841(b)(1)(A) (emphasis added). Defendants argue that "[t]he best and most natural interpretation is that the 'use' of a controlled substance is the active introduction of the controlled substance into one's body for the purpose of availing oneself of the substance's chemical effects" and that it "excludes passive exposure to drugs and the accidental introduction of them into the body." Def. Opening Br., at 3. Accordingly, defendants posit that the overdose enhancement is inapplicable here because the injured children accidentally introduced fentanyl into their bodies. By contrast, the Government urges "that the intent of the victims is irrelevant," and that ingestion of fentanyl, as occurred here, constitutes "use" within the meaning of the overdose enhancement. Gov't Opp'n, at 4, 11. For the reasons discussed below, the Court agrees with the Government and holds that the overdose enhancement is not dependent on the intent, knowledge, and volition of the victim who uses a controlled substance.

### a. Ripeness of the Motion to Strike

Before turning to the merits, the Court first addresses whether the motion to strike is ripe for adjudication at this juncture. The Government, for its part, argues that the Court need not resolve the statutory question now because the indictment is legally sufficient under Federal Rule of Criminal Procedure 7(c)(1) and the sufficiency of the evidence is not appropriately

addressed on a motion to strike. The Court agrees that the indictment and superseding indictment pass muster under the Federal Rules of Criminal Procedure because both indictments "track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." See United States v. Vilar, 729 F.3d 62, 80 (2d Cir. 2013).[3] The Court further agrees that as a general matter the "sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss." United States v. Alfonso, 143 F.3d 772, 777 (2d Cir. 1998). But here, the Government has made a full and detailed proffer of the evidence it expects to offer at trial with respect to how the minor victims died or were injured (i.e., through the unwitting ingestion of fentanyl). The Court accordingly finds it is proper to reach the merits and resolve the statutory question. Cf. id. at 776-77 ("*Unless* the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . ., the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss the indictment. (emphasis added)); United States v. Perez, 575 F.3d 164, 166-67 (2d Cir. 2009) (same). Moreover, in an era where nearly all federal criminal cases are resolved by plea bargains, it is only fair to defendants to let

---

[3] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

them know their maximum exposure at the earliest opportunity permitted by law.

### b. Meaning of the Word "Use"

The Court now turns to the merits. To determine the meaning of the word "use" in the overdose enhancement, the Court must begin "with the text of the statute." Van Buren v. United States, 593 U.S. 374, 381 (2021). Because "use" is not statutorily defined, the Court must "give [use its] ordinary meaning." Burrage v. United States, 571 U.S. 204, 210 (2014). See also Watson v. United States, 552 U.S. 74, 79 (2007).

The parties each offer, what in their view, is the ordinary meaning of the word "use." Defendants contend that the "ordinary or natural meaning" of "to use" is "to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of." Smith v. United States, 508 U.S. 223, 228-29 (1993).[4] See also Bailey v. United States, 516 U.S. 137, 144-45 (1995). Defendants further contend that the ordinary meaning of "use" excludes accidents. See, e.g., Voisine v. United States, 579 U.S. 686, 694 (2016) (explaining that in Leocal v. Ashcroft, 543 U.S. 1 (2004), the Court held that the term "use" in the statutory phrase "the use . . . of physical force against the person or

---

[4] In 21 U.S.C. § 841(b)(1)(A), "use" is employed as a noun, whereas in Smith it is employed as a verb. To the extent this difference is relevant, it tends to support the Government's interpretation, as set forth below.

7

property of another," "excludes merely accidental conduct"); Borden v. United States, 593 U.S. 420, 431 (2021) (explaining that the phrase "'use of force' denotes volitional conduct"); United States v. Scott, 990 F.3d 94, 109 (2d Cir. 2021) (en banc) ("[I]f there is a common principle running through these definitions [of use] that limits their reach, it is not that 'use' must be physical but, rather, that it must be conscious.").

The Government, on the other hand, argues that the ordinary meaning of "use" is "[t]he action of consuming something as food, drink, a drug, etc., esp. on a regular or habitual basis; the fact of being consumed in this way." Oxford English Dictionary, https://www.oed.com/dictionary/use_n?tab=meaning_and_use#16010028 (last visited Apr. 18, 2024). See also Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/use (last visited Apr. 18, 2024) (defining "use" as "to consume or take (as liquor or drugs) regularly" and "to expend or consume by putting to use").

In a vacuum, both the Government and defendants have pointed to plausible, ordinary meanings of the word "use." But that only confirms that the ordinary meaning of "the word 'use' poses some interpretation difficulties because of the different meanings attributable to it . . . depending on [the] context" in which it is used. Dubin v. United States, 599 U.S. 110, 118 (2023). The Court therefore must "look not only to the word itself, but also

8

to the statute and the surrounding scheme, to determine the meaning Congress intended." Id. See also Leocal, 543 U.S. at 9 ("Particularly when interpreting a statute that features as elastic a word as 'use,' we construe language in its context and in light of the terms surrounding it."). Based on the statutory context, the Court concludes that the term "use," as employed here, means consume or ingest, without regard to whether the victim knew they were consuming or ingesting a drug.

To start, the overdose enhancement must be understood in its specific context: drug use. On this score, it is telling that none of the cases that defendants rely upon for their definition of "use" arose in the drug context. See Smith, 508 U.S. at 227-29 (use of a firearm); Watson, 552 U.S. at 79 (same); Bailey, 516 U.S. at 144-45 (same); Scott, 990 F.3d at 112 (use of physical force); Borden, 593 U.S. at 430-31 (same); Voisine, 579 U.S. at 692 (same); United States v. Castleman, 572 U.S. 157, 170-71 (2014) (same). Defendants, for their part, concede on reply that they "have no quarrel with the government's observation that 'use' of a controlled substance can involve ingesting it." Def. Reply Br., at 3. Defendants, however, continue to maintain that "[i]ngestion constitutes 'use' only when it is conscious and volitional." Id. That interpretation, however, is not supported by the statutory

context and structure of the overdose enhancement, for the following reasons:

First, defendants' interpretation would require the Court to impermissibly read a knowledge, volition, or intent requirement into the statute. The statute does not say "if death or serious bodily injury results from the *knowing* use of such substance," "if death or seriously bodily injury results from the *conscious* use of such substance," or "if death or serious bodily injury results from the *intentional* use of such substance." Instead, the statute is silent as to the victim's required knowledge, volition, or intent. The Court views this silence as purposeful because Congress evidenced in a neighboring statutory provision that it knows how to add such a qualifier if it so chooses. See 21 U.S.C. § 841(a)(1) ("[I]t shall be unlawful for any person *knowingly* or *intentionally* . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." (emphasis added)); In re New Haven Projects Ltd. Liab. Co., 225 F.3d 283, 288 (2d Cir. 2000) ("[I]t is generally presumed that Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another.").

Second, the provision in question centers on the actions of the victim, not the defendant. The overdose enhancement is thus unlike the cases that defendants rely upon for their position that

10

"use" requires volitional, rather than accidental, conduct, as all those cases center on what it means for a defendant to "use" a firearm or physical force. See Smith, 508 U.S. at 225-37; Watson, 552 U.S. at 77-79; Bailey, 516 U.S. at 138-46; Scott, 990 F.3d at 99-104, 108-13; Castleman, 572 U.S. at 159-62, 170-71; Borden, 593 U.S. at 423-32; Voisine, 579 U.S. at 688-95. This distinction is critical because defendants' cases must be understood against the backdrop of a fundamental principle of criminal law: that a defendant is only guilty of a crime if a defendant commits an *actus reus* (a conscious, volitional act) with the requisite *mens rea* (a guilty mind). See Morrissette v. United States, 342 U.S. 246, 251-52 (1952); United States v. Apfelbaum, 445 U.S. 115, 131 (1980). There is, however, no general principle that a defendant's responsibility for a crime should hinge on a victim's volitional act or intent. Instead, whether a victim intentionally took some action is generally irrelevant to a defendant's culpability for a criminal act. Thus, in the context of a sentencing enhancement that centers on the victim, it makes no sense to import a definition of "use" that developed in the context of what it means for a defendant to "use" a firearm or physical force.

Third, it would be highly anomalous to import the defendants' definition here because courts have interpreted the overdose enhancement as imposing strict liability when a defendant is the but-for cause of an overdose death without regard to the

11

foreseeability of the victim's death to the defendant. See, e.g., United States v. Jeffries, 958 F.3d 517, 520-21 (6th Cir. 2020) (The overdose "enhancement does not require proof of proximate causation," "only but-for causation."). As the Seventh Circuit aptly explained, because of "the extremely hazardous nature of drug distribution, a policy of strict liability when death occurs fits the statutory language and its evident purpose." United States v. Harden, 893 F.3d 434, 448 (7th Cir. 2018). Thus "this criminal statute treats death as categorically foreseeable, regardless of whether this particular defendant foresaw or should have foreseen such a result." Id. Accordingly, if a defendant's knowledge and intent with respect to whether a victim would use a drug and die is irrelevant to the applicability of the overdose enhancement, it follows a fortiori that a victim's intent and knowledge should also be irrelevant to the applicability of the overdose enhancement.[5]

Fourth, the grammatical structure of the overdose enhancement confirms it is agnostic to the victim's volition, knowledge, and intent. The overdose enhancement is written in the passive voice. It is thus "focuse[d] on an event that occurs without respect to a specific actor, and therefore without respect to any actor's

---

[5] The Court sees no reason why the foregoing analysis differs if serious bodily injury, instead of death, resulted from the use of the controlled substance.

intent or culpability." Dean v. United States, 556 U.S. 568, 572 (2009). See also United States v. Burkholder, 816 F.3d 607, 614 (10th Cir. 2016) ("[T]he use of the passive voice evinces a concern with whether something happened--not how or why it happened."). Defendants argue this canon of construction is inapplicable because "use" is here employed as a noun and thus not written in the passive voice.[6] That argument misses the forest for the trees. For one thing, "use" as a noun is, virtually by definition, less indicative of volitional intent than when employed as an active verb. And, in any case, "use" is here part of a longer statutory clause that is undisputedly written in the passive voice. Thus, the passive structure of the clause should still inform the meaning

---

[6] Defendants also argue that "Congress employed the same 'use of' construction in the 'use of force' language that the Supreme Court and the *en banc* Second Circuit have construed to require conscious and volitional conduct and to exclude accidents." Def. Reply Br., at 9 (citing Scott, 990 F.3d at 109; Borden, 593 U.S. at 430-31; Voisine, 579 U.S. at 694). Those cases are distinguishable because none involved a statutory clause that was written in the passive voice. Voisine interpreted 18 U.S.C. § 921(a)(33)(A), which defines "misdemeanor crime of domestic violence" to be "an offense that is a misdemeanor under Federal, State, Tribal, or local law; and has, as an element, the use or attempted use of force." Voisine, 579 U.S. at 689. Similarly, Borden interpreted 18 U.S.C. § 924(e)(2)(B)(i), which defines "violent felony" as "any crime punishable by imprisonment for a term exceeding one year . . . that has as an element the use, attempted use, or threatened use of physical force against the person of another." Borden, 593 U.S. at 423-24. Finally, Scott interpreted definitions of "violent felony" and "crime of violence under ACCA and the Career Offender Guidelines," which both "define a violent crime by asking whether the crime 'has as an element the use, attempted use, or threatened use of physical force against the person of another." Scott, 990 F.3d at 103-04.

13

of "use." See Bartenwerfer v. Buckley, 598 U.S. 69, 75-76 (2023) (finding that the passive-voice construction of a discharge exception, which prohibited a debtor from discharging "a debt for money . . . obtained by . . . actual fraud" was relevant to determining whether the fraud, from which the debt arises, must be the intentional fraud of the debtor). The Court therefore finds that the passive structure of the overdose enhancement further counsels that the intent and volition of the victim is irrelevant to the applicability of the enhancement.

In sum, the Court concludes that the statutory text contemplates no inquiry into the victim's intent, knowledge, or volition. The Court thus declines defendants' invitation to rewrite the statute to add a knowledge, intent, or volition requirement.

Because the meaning of the enhancement is plain from its text and statutory context, the Court need not resort to the rule of lenity or legislative purpose. See Oklahoma v. Castro-Huerta, 597 U.S. 629, 642 (2022); Ocasio v. United States, 578 U.S. 282, 295 n.8 (2016). However, the Court notes that defendants' construction of the statute would lead to results that are incongruous with the evident purpose of the overdose enhancement. The Government argues that defendants' interpretation of the statute "would perversely restrict the relevant sentencing enhancement to only those cases involving victims who directly, openly, and intentionally embraced

the risks of drug consumption, and entirely carve out the most vulnerable, naïve, and unwitting victims of drug trafficking." Gov't Opp'n, at 18. The Court agrees. Under defendants' interpretation, harm to the most innocent victims of drug use, children and individuals who are unaware they are eating or drinking something laced with a lethal amount of a controlled substance, would not result in a sentencing enhancement for the culpable defendant. That does not align with Congress's clear purpose in promulgating the overdose enhancement: to punish drug dealers whose drug dealing results in overdose deaths or serious injuries from the use of such drugs. See United States v. Patterson, 38 F.3d 139, 145 (4th Cir. 1994) ("The statute puts drug dealers and users on clear notice that their sentences will be enhanced if people die from using the drugs they distribute."); United States v. Robinson, 167 F.3d 824, 831 (3d Cir. 1999) ("Congress recognized that the risk [of death and serious bodily injury] is inherent in [drugs] and thus it provided that persons who distribute [drugs] do so at their peril."); Baker, 2007 WL 148796, at *8 ("Congress . . . intended to penalize drug traffickers for their conduct in *distributing* the drug rather than for the victim's specific conduct in their use of the drug."). Thus, even if the Court were to consider the legislative purpose

15

of the overdose enhancement, it would find it supports the Court's interpretation of the plain text of the enhancement.

In sum, the Court finds that the overdose enhancement covers a victim's unwitting ingestion of fentanyl. And here, because the Government's theory is that the minor victims ingested fentanyl, the Court finds that the overdose enhancement is applicable to this case.[7] The motion to strike is therefore denied.

### III.  Conclusion

In conclusion, the Court denies defendants' motion to strike the overdose enhancement. The Clerk of Court is respectfully directed to close docket entry numbers 25, 26, and 27 on the docket.

SO ORDERED.

Dated:    New York, NY

     April 18, 2024                   _____
                                                JED S. RAKOFF, U.S.D.J.

---

[7] Of course, nothing in this opinion limits defendants' ability to argue at trial that the Government has failed to prove that the minor victims ingested fentanyl.